HONORS, GOOD MORNING. I'M RANDY HESS. I REPRESENT THE APPELLANTS, MR. PRIMIANI, COYLE, WAGMAN, ANDERSON, AND MR. FRANCEI. YOUR HONORS, THIS CASE COMES OUT OF A GRANTING OF A SUMMARY JUDGEMENT MOTION IN WHICH THE DISTRICT COURT RULED THAT AS A MATTER OF LAW, MY CLIENTS, THE APPELLANTS, WERE NOT INSURED. THE COURT HELD THAT AS A MATTER OF LAW, THERE WAS NO TRIBAL ISSUE OF FACT, THAT MY CLIENTS, AT THE TIME THEY MADE ALLEGED DISPARAGING STATEMENTS, WERE NOT ACTING IN THEIR SCOPE AS OFFICERS, DIRECTORS, OR EMPLOYEES OF MY CFO. I GUESS WHAT WE NEED YOU TO DO IS TO POINT TO US SPECIFIC DISPUTED QUESTIONS OF FACT. SURE. THE FACTUAL INFORMATION THAT SHOWED THAT THE APPELLANTS WERE IN FACT ACTING IN THE CORRESPONDENT SCOPE OF THEIR EMPLOYMENT AS OFFICERS AND AS DIRECTORS ARE MANY. FIRST, THERE IS THE THIRD AMENDMENT COMPLAINT THAT WAS FILED IN THE UNDERLYING CASE BY HARRIS. IN PARAGRAPH 80 OF THAT COMPLAINT, THE COMPLAINT SPECIFICALLY ALLEGES THAT EACH OF THE APPELLANTS USED THEIR POSITION AT MY CFO TO DISPARAGE HARRIS. THERE IS A SPECIFIC ALLEGATION. BUT HOW DOES THAT SHOW THAT THEY WERE ACTING IN THE CORRESPONDENT SCOPE OF THEIR DUTIES? SURE. TO MY CFO. RIGHT. NOT FOR THEIR NEW COMPANY. RIGHT. IN ORDER TO STEAL CLIENTS FROM MY CFO THAT WOULD OTHERWISE GO TO HARRIS. ABSOLUTELY. AND THE QUESTION, HOW DOES THIS POSSIBLY HELP OR PROTECT MY CFO? SURE. OKAY. IN TERMS OF THE FACTS, WHAT ACTUALLY WAS GOING ON BACK IN 2002. PARDON ME. YEAH. WHATEVER FACTS WERE GOING ON IN 2002 IS NOT WHAT INVOKES THE DUTY OF COVERAGE WHICH GIVES YOU A DEFENSE AND INDEMNITY. WHAT INVOKES THE DUTY OF COVERAGE, IF AT ALL, ARE ONE, THE ALLEGATIONS OF HARRIS' COMPLAINT AGAINST YOUR CLIENTS. AND TWO, THE FACTS WHICH ARE JUDICIALLY NOTICEABLE. SO WITHIN THOSE TWO AREAS, AS FAR AS I CAN UNDERSTAND UNDER CALIFORNIA LAW, YOU MAY ADDRESS FACTS. BUT SIMPLY ADDRESSING FACTS OF WHAT WAS GOING ON WHICH ARE NOT IN THE COMPLAINT OR JUDICIALLY NOTICEABLE WOULD BE IRRELEVANT. CERTAINLY. OKAY. THE CLAIM DISPARAGEMENT WAS THAT THE APPELLANTS WENT TO CLIENTS AND ALLEGEDLY TOLD THE CLIENTS THAT HARRIS WAS LIKE A BANK OF AMERICA, WAS NOT A SMALL SHOP LIKE MY CFO, THAT THE TYPE OF SERVICES PROVIDED BY HARRIS WOULD IN NO WAY MEET THE QUALITY OR NEEDS OF THE CUSTOMERS. THAT WAS A DISPARAGEMENT. THOSE STATEMENTS WERE MADE BECAUSE MY CFO'S CHIEF EXECUTIVE OFFICER, ART SHAW, TOLD EACH OF THE APPELLANTS, YOU HAVE TO GO OUT AND GET THESE CONSENT FORMS SIGNED. NOW WHERE IS THAT IN THE COMPLAINT? THAT THOSE STATEMENTS WERE MADE BECAUSE THE CFO TOLD YOUR CLIENTS TO GO OUT AND GET THE AGREEMENT. WHERE IS THAT IN THE COMPLAINT? THAT IS EXTRINSIC EVIDENCE. THERE IS BROADER STATEMENTS IN THE COMPLAINT THAT SAY THAT THE APPELLANTS WENT AHEAD AND MADE THESE STATEMENTS, THESE DISPARAGING STATEMENTS. WHEN YOU LOOK AT THE ACTUAL FACTS, THOSE STATEMENTS WERE ONLY MADE. BUT WE CAN'T LOOK AT THE FACTS. WE'RE LIMITED TO LOOKING AT THE COMPLAINT AND WHETHER OR NOT THE ALLEGATIONS IN THE COMPLAINT ARE SUCH THAT COVERAGE IS TRIGGERED. WITH ALL DUE RESPECT, THE LAW IS THAT YOU HAVE TO, THE COURTS HAVE TO LOOK AT EXTRINSIC FACTS THAT ARE PRESENTED TO THE INSURER. EXTRINSIC FACTS ARE PRESENTED TO THE COURT. IN WHAT CASE AUTHORITY ARE YOU RELYING UPON TO SUPPORT YOUR ASSERTION THAT COURTS ARE OBLIGATED TO LOOK AT EXTRINSIC FACTS? The Horace Mann case. Horace Mann. From the Supreme Court. The Montrose decision of the California Supreme Court. Okay. Gray v. Zurich discusses it. Okay. I want specific language in the cases that you're relying upon to say that when we're determining scope of coverage, that we have to look at extrinsic evidence. What's the language in Horace Mann that you're relying upon? The language is that in determining whether there is a duty to defend, the insurer, at the time of the tender or resubmission, must take a look not only at the four corners of the complaint, but must look at all information that's provided to them, whether through discovery, whether through correspondence, to see whether or not there is a duty to defend. Recent Supreme Court decisions have even held that if there is extrinsic evidence, the insurer can rely on the extrinsic evidence to show there's no possibility of coverage. But the law in California for at least the last 40 to 50 years has been that we're not a four-corner state. We are, in fact, an extrinsic evidence state. As to facts which the record shows was known to the insurance company at the time, not what was really happening, but what facts were known to the insurance company, right? Exactly. So if you'll just zero in on the four corners of the complaint, facts judicially noticeable and facts known and proven in the record to have been known to the insurance company. All right? Certainly. Certainly. Now, are you telling me that the insurance company knew that the the my CFO employees were doing what you said they were going around to the clients and saying Harris is too big. Harris is like Bank of America. How was that helping my CFO? My CFO was selling certain assets to Harris. So it was helping my CFO because they need to get these consent forms signed. But that was that was the consent signed so that the clients stay with my CFO, which is being bought by Harris. Right now, how does telling the clients of my CFO Harris is going to be very big. And he's not going to give you the kind of individualized attention we've given you. Now, please sign this consent. Isn't that counterintuitive? The information that was provided to the insurer was in the course of providing the consent forms, the appellants gave the consent forms to their clients and said, we need you to sign these. And that was needed so that the transfer of the assets could go forward. The clients then asked the question, who is Harris Bank? Are they going to treat us the same way you've been treating us? Should we sign these forms? The clients answered, yes, you should sign the forms. The clients then asked again, who is Harris Bank? Are they going to give us the same type of service? The clients, in response to their request that they were told to do by Art Shaw, all of this is communicated. It's all in the record. It's all letters that were sent to the insurer telling exactly what I'm telling you right here. And the insurer still said there's no duty to defend. All this information was provided to the insurers. And they all said, no, that's not enough. That information was provided. Then in response, my clients responded truthfully. And they told them that Harris Bank is a bigger organization. It's not the small type of company that my CFO was, a hands-on type company. In response to that, they got sued only because they were told by my CFO's chief executive officer to get these consent forms signed. Well, counselor, there's a little more. They were opening a business as well, a competing business. And so that complicated the matter. If it were simply that they were being candid in terms of their description of the acquiring company or the acquiring entity, that would be different. But there's another wrinkle in there in that they were also allegedly stealing clients from my CFO at the same time. That's what the insurance company has tried to paint a picture of. Is that what the complaint said? The complaint made allegations of that. But there was also a declaration that was signed by the plaintiff's counsel that said that they were not only being sued for that. They were also being sued in the course and scope of their duties as my CFO officers. It wasn't exclusively unrelated to my CFO. I didn't quite paraphrase Mr. Chatterley's declaration in the summary judgment motion as well as I should have. But in terms of them setting up another company, that was not a secret. What was happening is the escrow between my CFO and Harris was very questionable whether that was going to close or not. If it didn't close, there had to be an alternative entity because my CFO would have filed bankruptcy. They would have had hundreds of clients who literally have millions, hundreds of millions of dollars, billions of dollars of wealth who would not have been represented. They would have had claims against my CFO. Tax returns needed to be filed. There had to be a backup plan for protection of the clients. That's why this other entity was open. There was no intent at that time to steal. Is that why Integrated Wealth Advisors was formed? That's why Integrated Wealth Advisors was formed. To protect the company. Absolutely. Absolutely. Is that what the complaint said? The complaint was silent on that issue. But that's what the facts are. That's what the truth is. What about paragraph 34 of the complaint? It says, Harris is informed and believes and on that basis alleges that before the close of the Harris-my CFO transaction, individual defendants and each of them determined to form and did form an entity to compete directly with Harris. The only way it would have competed with Harris is if the deal didn't go through. That was the intent. I realize that's the complaint. But when I asked you that about the complaint, you said the complaint was silent about that. I apologize, Your Honor. There is that sentence in the complaint that discusses that. Those allegations, though, are unfounded. The allegations, the real truth is if there was disparagement, my clients were acting only because they were told by my CFO to have consent forms assigned. They made these statements only because they were officers and directors and employees who were told to get the consent forms signed and to answer the client's questions. That's broad enough. It's a very broad coverage clause. And if we take a look briefly at the cases that National Union relies upon to say that if you're acting against the interest of your own company, you're not an insured, there's more to it than that. In the Loehm's case, for example, the court of appeal held that the defendant's president made the defamatory statements after he was no longer president. In the Bowie case, all the claims against the insured corporation had already been settled. There could be no claims for anyone acting in the capacity of the insured corporation. In the Malazzo case, the insurer did provide a defense. It was an issue of indemnity. The jury had come back and already rendered a final, there was a final verdict that that particular insured had acted in breach of their fiduciary duty. Here we have allegations that are all denied, allegations from the appellant's perspective that were totally frivolous and meritless, that were filed by a company to drive them out of business and to prevent Harris from having to pay my clients the monies that they owed them. It was merely a preemptive, frivolous, meritless lawsuit. Didn't you tell me just a moment ago that the plaintiff's attorney filed a declaration in your favor saying that these statements by the employees, the appellants here, were for the benefit of my CFO? Well. And there's a reason for that. Because any good plaintiff's attorney wants to make sure that the defendants in that case have coverage. Your Honor, he would only consent to sign that after the case was, the underlying case settled, which was shortly before the hearing after the filing of the motion of the summary judgment. He then agreed to sign a declaration, very limited. Is that in our record? It was after the motion of summary judgment? Yes, Your Honor. The dates are after the filing of the motion of summary judgment but before the hearing. Before the hearing. Now, what sort of credibility are we supposed to give to that when it's obvious that he's doing it for his own interest? I can represent to the court that there was no monies being paid to Harris. There's no evidence of that at all. It was absolutely, there was no reason to him to benefit him. There is because he gets coverage for the defendants. That was something that's not part of the settlement or otherwise, Your Honor. So I can represent to the court that the plaintiff's counsel had absolutely no benefit in signing that other than saying in basically one paragraph what the truth was. That's an argument. Okay. Pardon me for interrupting you. If we look at the Barnett v. Fireman's Fund, if there's just one case to read, that case is basically this case with different names. That case involved doctors. And the doctors were told by their new employer to go ahead and do various things. They went ahead and talked to the patients. And they told the patients that they were unhappy with their employer. The employer sued the doctors for defamation. And the court of appeal held that the doctors in answering truthfully to their patients these issues that concerned them was not a reason to deny coverage. They're still insurers. And the court of appeal gives a test. The test is, was the defendant acting in an insured capacity when they allegedly made the injury-producing conduct? In this case, it's the same thing. The appellants were acting in their alleged, were acting in their insured capacity, getting the consent forms when they were sued for the alleged injury-producing conduct, the alleged disparagement. In Barnett, the employer's complaint expressly alleged that the former officers were acting with respect to their duties as med partners and executive officers. Here, is there such an allegation? There are allegations detailing that each of the appellants were officers, directors, or employees. But is there an allegation that they were acting with respect to their duties and discharging their duties to my CFO? It's extrinsic evidence, not the complaint itself, other than paragraph 80 that says they used their position at CFO. That paragraph 80 is an express statement. But it doesn't say they were acting within the scope of their duties. It says they used the information they acquired as officers of my CFO or employees. I believe it says use their position. Use their position or whatever. But it didn't say they were acting in their position. They didn't use the exact words. But if there's any questions, certainly, this is a summary judgment motion. This is saying as a matter of law, there is no way that these people were acting as insureds. Everything that we told the insurance company about that, we were the good guys. There was nothing we did wrong. We were only following orders from my CFO's executive officer. All of that was just thrown out the window. We at least should be able to go to a jury. You can't seriously be arguing that you were following orders if the allegations of the complaint are true, that your clients were stealing employees, stealing information, setting up a competing business. You can't be seriously arguing that those actions were taken under orders to assist in the sale of my CFO. If the statements were true, that would be correct to the extent. Actually, it's not because it's a different company. Harris, my CFO didn't care what Harris did with the assets after they were sold. My CFO didn't care in terms of particularly what the appellant said. But in order for the sale to be consummated, a certain percentage of the clients had to remain with my CFO. Isn't that correct? No. A certain number of the consent forms needed to be signed. There was no what's called a clawback form. If the next week all those clients left, it didn't matter. They had to agree. They had to sign the forms, and my clients got 100 percent of the consent forms signed by their clients. They did what they were told to do. They helped my CFO. They may not have helped Harris from Harris' perspective, but ultimately, they really did nothing wrong. That's what- Do you have some time for rebuttal? Yes. Thank you. May it please the Court, Mark Bonino from the Roper's Office, appearing on behalf of the National Union. The Court has already focused on what the test is here for the purposes of establishing not merely the capacity or not merely the status of the plaintiffs as being within having a position of employment or of an executive officer, but also acting within that capacity at the time of the allegations that are being asserted against them. And that is the critical part of the requirement that is not met by the claims here and that the Court has focused on. It's focused on in the Barnett case, which the plaintiffs cite and have cited again and again. And as Judge Bea pointed out, in that case, that element was satisfied because in the Barnett case, there was an express allegation that the officers were acting in their course and scope of their positions with the company at the time they were doing what they did for the purposes of the company. And that was on demur. But this is on demur. This is a motion of summary judgment. Isn't counsel correct, isn't Mr. Hess correct, that not only do we have to consider the complaint, facts traditionally noticeable, but also extrinsic evidence made known to the insurance company before the decision of non-coverage and non-defensive made? Absolutely, Your Honor. That is correct. That's the state. What do you say to his claim that the insurance company had information made known that the procurement of the consents was at the direct order of the MyCFO chief executive? What you will find when you look in the records, Your Honor, is that what the insurance company had before it at the time were the three complaints, because ultimately the First Amendment, Second Amendment, and Third Amendment complaints were all sent to the insurance company, 60 pages of pleadings. And they had two letters from counsel for the plaintiffs. And those two letters are in the record, and I believe page 263. For these plaintiffs? Yes, Your Honor. When they were demanding the defense, they submitted, they tendered the case. And then once the claim was denied, they sent a letter saying, you should not have denied this for the following reasons. That's at page 263. And there is another letter, and I believe that one starts at page, excuse me. 263 of the excerpts of record? 263 of the excerpts of record. Yes, Your Honor. And there's one more. I believe it's at 290 or so of the excerpts of record. Those are the two letters that were sent to National Union. But those letters do not assert what was later asserted in this case, in this case, in the coverage case. And that is that the reason that. 263 of my excerpts of record has to do with. Oh, I got it. Yes, I did. Yeah, there's double numbers on all these pages. I'm reading the small number, not the large number. It should be the number in bold. Okay, gotcha. I'm sorry. The two letters you say, what the insurance company had before it were the three complaints, 66 pages, and the two letters from the appellant, today appellants, then plaintiffs, seeking coverage at 263 and at 290? Yes, Your Honor. It may not be precisely. Just one moment. I'll find a precise page. It's a two-page letter confirming a telephone conversation of January 27. It is between 290 and 300 of the excerpts of record. But neither of those letters, and the complaints themselves, do none of those allege that the insurers, anything about the insurers acting in a fiduciary duty and saying these things because they had a belief that they had to protect these clients of the underlying company, MyCFO. That has been the assertion that is made in this case. It did not arise until after this case started. And, in fact, when you look at the declarations of the plaintiffs even submitted in this case, the Francais declaration and the Premiani declaration, what they say is they became dissatisfied with the Harris transaction in Premiani's case in September, in Francais' case in October 1st, and started making contingency plans for a separate company that they were going to set up, which was going to compete. And the gravamen of the case brought by Harris, as the Court has already pointed out, is that these plaintiffs were competing with Harris' business, had, in the process of the competing, taken information that they were not entitled to take from MyCFO, had transferred it over to their new corporation, were saying things that were slanderous to the organization or disparaging to the organization of Harris as part of that. And that was the nature of the claim. It was not that they were doing things on behalf of MyCFO and MyCFO was a bad company. In fact, MyCFO was not named as a defendant in the action brought by Harris. So this late-breaking fiduciary duty argument, if you will. I'm having trouble understanding the basis for any fiduciary duty between employees of CFO and the clients of CFO. I mean, I can understand a contractual duty, but what's the claimant's fiduciary duty? I'll probably let Mr. Hess respond to this, but my understanding, Your Honor, is that MyCFO is a company where the plaintiffs here and the other employees act, in essence, as the financial officers for small corporations that cannot otherwise afford to have their own in-house. So it's an outsourced, if you will, financial officers. And as financial officers for these various clients of MyCFO, they assert that they owe their clients fiduciary duties, just like your banker would owe you or me or whoever. So I think that's the nature of the fiduciary duty. That's the agent or employee's fiduciary duty whose principle. Right. That's my understanding. Again, I could be wrong, but none of that was communicated. If you look through those letters, you will not see fiduciary duties communicated to National Union back when this was being tendered to National Union. And the nature of the claim, again, is not focused on these employees performing their fiduciary duties. It's focused on these employees, in essence, stealing assets of MyCO that were intended to go to Harris or using assets of MyCFO that did go to Harris, but they were things like client lists, information about employees and other things that these plaintiffs then used to their own advantage to compete with Harris. And that is outside of the scope of the duties that they owed to MyCFO. What about addressing, as I understood it, a declaration by a Harris attorney that these individuals were acting for CFO? Three things about that, Your Honor. First of all, as the court knows under California law, going all the way back to Gray v. Zurich, which I discovered getting ready for this is 40 years old, the court has long said, the California Supreme Court has long said that the claims and assertions of the third party, the underlying plaintiff, for example, plaintiff's attorney here, cannot be the determining factor. The words of the court are they are not the arbiter of the coverage. And the reasons for that is because various plaintiff's attorneys might have reasons for steering cases toward coverage or away from coverage depending on what goals they were trying to accomplish. That statement has been repeated in a number of places, including in the Montrose case. Sometimes it works to the benefit of the insurer. Sometimes it works to the benefit of the insured. Here there was no statement by the plaintiff's attorney until the motion, the underlying plaintiff's attorney, excuse me. And you saw coverage getting away from it. Well, no, I think the underlying case was over at that point, but it didn't come until this motion for summary judgment was filed in this case. And, in fact, strangely in this case, Federal, the primary carrier, contacted the attorneys for the plaintiffs during their coverage investigation. And Mr. Hurwitz, who is Mr. Hess's predecessor, wrote them a blistering letter, which is in the excerpts of record at page 96, accusing them of bad faith conduct for talking to the plaintiff's attorney. And, in fact, if you look at the Harris, I'm sorry, the bad faith complaint that was filed here at page 11 of the excerpts of record, which is the very beginning of the complaint, you will see that that was one of the assertions of bad faith that they were making against Federal. In other words, that they shouldn't have been talking to the plaintiff's attorney, the underlying plaintiff's attorney. All of that aside, if you look at the declaration itself that Mr. Chatterjee signed, it is at page 413 and 414 of the excerpts of record. And what he says is, against a backdrop of a case where there's 60 plus pages of pleadings talking about how these plaintiffs have been misappropriating my CFO assets for their own purposes, he says, he finishes up by saying, let's see, Harris did not contend that defendants' alleged statements were completely outside the scope of their duties as officers, directors, and employees of my CFO. That's all he says. He didn't say they're inside. They pretended that they were within the scope. That's right. And so if this is a fortress of the pleadings that they're relying on, in our view, it's not much of a fortress. And given the nature of this case, again, we're not trying to focus in on some technical defect where the whole case involves their operation as representatives of my CFO and there's some gotcha clause in the policy. The nature of this case had nothing to do with these plaintiffs' business or duties as my CFO. There was no information given to the carrier at the time that established that it did. It was their burden, plaintiff's burden. And it's plaintiff's burden in a case where they are attempting to procure coverage to bring the case within the scope of the coverage. It's the defendant's burden to prove exclusions. But here the definition of insured under the very case they cite, Barnett, is part of the scope of the coverage. It's their burden to bring that up. If it's not in the complaint to bring in the extrinsic facts, they didn't do so here, the judgment should be affirmed. Unless the Court has any further questions. It appears not. Rebuttal. Thank you, Your Honors. This case wasn't settled, the interline case wasn't settled until a few weeks after the summary judgment motion was filed. And the insurer has a continuing duty to review all facts and information to see whether the defense is triggered or not. All the information provided in the summary judgment motions, all the declarations were provided to National and Union and they still said no, we're not going to defend. Even with all the information provided to you, National and Union says we would not have defended. This isn't an issue where we kept facts back. The record reflects that we pleaded with National and Union to come to the mediation, come to a settlement conference and get the information that was out there to just attend. We didn't even ask them for money. We just wanted them to get facts. They refused to come. With regard to the statement as to my predecessor counsel and the issue as to contacting the plaintiff's counsel, Harris's counsel and interlying action. Counsel, at page 266 of the excerpt of the record, the letter of Mr. Horowitz reads that your insurer's dispute, that's your client's, dispute any contention that prior to leaving my CFO, their communications with customers or Harris employees were not within the course and scope of their employment with CFO. Is that as far as you got as to alleging why they were within the course and scope of employment? No, Your Honor. More information was provided. All the information contained in the summary judgment materials was provided to National and Union. All of that information. So counsel was wrong in saying that we have to look only at the three complaints and the two letters. You say that we have to look at more than that. Yes, Your Honor. You have to look at the entire summary judgment motion. Those materials were presented to National and Union, and request was made that they make a reevaluation and provide a defense. Instead, they insisted that even with all those facts, even with the extrinsic evidence we provided to them in the summary judgment motion, with the case still proceeding, there was still no duty for them to provide a defense, even with the information that our clients gave the consent forms and made these statements as. So, Your Honor, you're saying that there's a continuing duty by the insurer not only after they've asked for the information and you sent them the complaint and the two letters, but when the motion of summary judgment materials show that they got more. So are you saying that the insurers have to take a look at your motion for summary judgment and that material should also go into the determination of whether there's coverage? Yes, Your Honor. While the underlying case is going forward, but also National and Union was specifically requested to review those materials. There was still the response, this isn't enough. We don't believe they're insured. We don't believe, even if everything you say is correct, Mr. Hess, they're not insured. It doesn't matter. That was the response. Okay. There's also, there's a White v. Western title that says there's a continuing duty during litigation to review the materials on defense issue and the Iger v. Worthington case that we've cited on the need for an insurer to investigate. All right. Thank you, counsel. You've exceeded your time. Thank you to both counsel. Thank you. I appreciate your time. All right. Thank you. For argument in this case, the case just argued is submitted for decision by the court. The final case on calendar for argument is United States v. Dane et al. Counsel, for the defense, have you decided how you're going to share your time? Yes, Your Honor. Steve Lathrop on behalf of Richard Miller. Yes, Your Honor. Jeff Price. I will address that at the beginning of the argument. I will be arguing first. All right. Thank you. Thank you.
judges: D.W. Nelson, Rawlinson, Bea